APPEAL OF NELLIE KENEFICK, EXECUTRIX OF THE
ESTATE OF WILLIAM KENEFICK, DECEASED.

Docket No. 523. Submitted April 10, 1925. Decided February 11, 1926.

1. Where stock was sold in 1918 at a price equal to the fair
market value of the stock at the date of its acquisition, on ex-
change for other stock in 1917, *held*, no loss was sustained in
1918 on such sale.

2. Certain debts *held* properly deductible as worthless in the
year 1918.

*Arthur Miller, Franklin C. Parks* and *Alton Gumfiner, Esqs.*, for
the taxpayer.

*Robert A. Littleton, Esq.*, for the Commissioner.

Before MARQUETTE and IVINS.

This is an appeal from the determination of a net deficiency in
income tax for the year 1918 in the amount of $20,723.40. Two
questions are raised. (1) Whether the decedent sustained a loss
on the sale of certain stock in 1918; and (2) whether a partnership
of which the decedent was a member was entitled to a deduction for
a bad debt in 1918.

FINDINGS OF FACT.

The taxpayer is the executrix and sole residuary legatee of the
estate of William Kenefick, who died in 1921 and was a resident of
Kansas City, Mo.

The decedent and his wife (the executrix and taxpayer in this
appeal) had separate and independent estates, the estate of Mrs.
Kenefick being greater in 1917 than the estate of her husband.
They conducted their respective affairs and made their investments
separately and independently, and kept separate records.

In 1906, Mrs. Kenefick invested $100,000 out of her own funds
in stock of the Banque Franco Americaine, a French banking corpo-
ration of Paris, France, which was organized and operated with an
extensive foreign investment department, having for its main pur-
pose the underwriting and placing in France of issues of American,
English, Italian, and Spanish industrial and railroad securities;
and it had large investments in the Asti Chevasso Railway in Italy.
One Day, a son-in-law of the Keneficks, was the American repre-
sentative of the bank. Mrs. Kenefick made the investment upon
the advice of her husband, and for some years up to 1913 annually
received dividends of 5 per cent on the stock.

In 1913, owing to the unsettled condition of European affairs and
the resulting loss of interest by foreign investors in securities of
the bank, it was decided to liquidate the bank's affairs during sol-

vency.  The commercial department of the bank was sold in 1913, prior to the appointment of the liquidator, to an English bank at a profit of $250,000.  Thereafter, the liquidation continued and is still in process.  The advent of the European War in 1914 and the moratorium decreed by the French Government caused a suspension of the liquidation during the war years.

In March, 1917, the decedent invested $100,000 of his own funds in stock of the Blue Mound Mining Co., a corporation which was engaged in the mining of zinc.

From 1913 on, Mrs. Kenefick frequently complained to the decedent because the French bank stock paid her no dividends and held him to blame for the unprofitable investment which she had made.  In August, 1917, the decedent made an exchange with Mrs. Kenefick of his Blue Mound Mining Co. stock—which was paying dividends and gave promise of being a safe investment—for the stock of Banque Franco Americaine which Mrs. Kenefick owned.

The stock of neither company was listed on any stock exchange. That of the Blue Mound Mining Co. was closely held by some half dozen individuals.  That of the Banque Franco Americaine was sold through Day, and no sales occurred between 1913 and 1918, prior to August, when the decedent sold the Banque Franco Americaine stock to Day for $10,000, receiving Day's note in payment therefor. The only payment made by Day on the note was on March 13, 1925, when $1,709.46 was paid on account of the principal of the note. No interest payments have been made.

The first report of the liquidator of the bank's affairs was made in 1919, and the first dividend in liquidation was paid in 1924, when Day received the equivalent of approximately $1,400.

The fair market value in August, 1917, of the stock of the Banque Franco Americaine, which the decedent then received on the exchange of stock with Mrs. Kenefick, was $10,000.

In his return for 1918 the decedent claimed a loss of $90,000, resulting from the sale by him of the stock of the Banque Franco Americaine.

The decedent was a partner with one Hoffman, his son-in-law, doing business under the name of Hoffman Tie & Timber Co.  Their interests were one-half each.  The M. O. G. Land Improving Co., a corporation of which Hoffman was president and a stockholder, owned land in Oklahoma which was believed to be valuable for its oil content.  In 1918 the corporation owed the partnership a little over $29,000, which amount the partnership charged off on its books in 1918 as worthless and uncollectible.  The corporation did no business after 1917, and the entire indebtedness of $29,000 was incurred prior to 1917.  In 1916 the corporation had liabilities of some $47,000

and assets of about $4,000, not including real estate. With reference to all of the corporation's real estate, tax certificates had issued by 1916 by reason of the nonpayment of taxes imposed on the land under the laws of Oklahoma. In 1918 the land was sold for nonpayment of taxes and deeds were delivered therefor. After the tax sales of the land in 1918 the partnership considered the debt as worthless, and the decedent claimed as a bad debt deduction, in his return for 1918, one-half of the indebtedness owing the partnership.

The M. O. G. Land Improving Co. was also indebted to the decedent in the sum of $2,000. Of this sum $1,000 had been loaned by him to the corporation prior to 1916, and the other $1,000 arose from the payment by the decedent in 1917 of a note of the corporation, on which note the decedent was an endorser. The decedent claimed the amount of $2,000 as a bad debt deduction in his return for 1918.

### DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination will be settled on 7 days' notice, under Rule 50.

### OPINION.

MARQUETTE: The first question presented relates to an alleged loss of $90,000, claimed to have been sustained in 1918, upon the sale of stock of the Banque Franco Americaine to Day. It is the contention of the taxpayer that, at the time of the exchange in August, 1917, the stock had a value equal to its par value of $100,000, and that this value should be used as the basis for determining the loss on the sale in 1918. The Commissioner held that the stock had no value at the time of the exchange in 1917 in excess of the sales price realized in 1918, and disallowed the deduction. The value of the stock at the time of the exchange is, therefore, the point upon which the taxpayer's case hinges. The testimony offered to prove the fair market value of the stock of the bank in 1917 was that of Day, a son-in-law of the decedent, who had been the representative of the bank in the United States. His evidence consisted principally of his opinion as to how the bank would pay out on liquidation and the history of the institution. His only expression of value in August, 1917, is found in the following quotation from his testimony on cross examination:

Q. So, you think that the stock would have been worth about as much in August, 1917, as it was in 1918, when it was sold to you?
A. Yes, sir.
Q. About the same value?
A. Yes, sir.
Q. You placed about the same value on the stock?
A. Yes, sir.

No actual sales of the stock occurred prior to that by the decedent to Day. No evidence was produced by the taxpayer to show the financial condition of the Banque Franco Americaine, or otherwise, to assist in a determination that the fair market value of the bank stock at the time of the exchange in 1917 was other than as testified in the above quotation.

The decedent knew from investigation, and from conversations with Day, the condition of the Banque Franco Americaine. He had sent his attorney to Europe on at least two occasions to bring back a report on the situation. The attorney was produced as a witness, but declined to express any opinion as to the value of this stock. There were no other sales than the one to Day in 1918. Day certainly knew the situation, at least as well as the decedent did. We have Day's testimony that the value in 1917 was no different than when he purchased the stock in 1918. True, there was no market in 1917, in the sense of there being a willing buyer and seller, but there is nothing in this appeal to show that the 1917 value was any greater or less than the value in 1918, and, upon the record as it stands before us, we can come to no other conclusion than that the sale in 1918 and the testimony of Day express the fair market value of the stock in 1917. It follows that the $90,000 was not deductible as a loss sustained in 1918. Whether the loss, if any, was deductible in 1917, is not before us for determination.

The remaining questions relate to the deduction of bad debts owing to the decedent by a certain corporation, which was engaged in the business of the development of Oklahoma oil lands.

In 1916, the corporation had liabilities of some $47,000 and assets of about $4,000, without including among the assets any value for the oil lands which were owned by it. Those lands were subject to unpaid taxes accumulated through a series of years. Tax lien certificates had issued in 1916, but under the laws of Oklahoma the land could not be sold for the tax obligations until the expiration of two years. During the interim there was the possibility of the discovery of oil, which, when availed of, would have offset the taxes and all other liabilities and quite probably netted a considerable amount in excess thereof.

The decedent, being conversant with the situation, delayed any charge off of the obligations until there was a final certainty that they could never be paid. Such, in his opinion, occurred in 1918, when deeds for the property were delivered because of the non-payment of the taxes.

The determination by the Commissioner disallowing the deductions for bad debts constitutes *prima facie* evidence that the debts were not ascertained to be worthless and charged off within the

year 1918. The taxpayer has sustained the burden of proof by evidence showing the divestment of all title to the lands in 1918 and the possession of no assets by the debtor out of which the debts might be paid. It was then incumbent upon the Commissioner to submit to us the proper evidence showing that the debt was ascertained to be worthless in some year other than 1918. The Commissioner contends that the debt was ascertained to be worthless in 1916, because the debtor then had liabilities of $47,000 and assets of $4,000, *without including the oil lands therein.*

Assuming that the tax-lien certificate constituted a sale of the land, subject to the condition subsequent of redemption by the discharge of the lien within two years, that equity or right of redemption was an asset the value of which would be determined by the value of the land less the lien and other charges in connection therewith. We do not deem that it was incumbent upon the taxpayer, under our rules, to negative a contention by the Commissioner, but rather that the Commissioner should prove the worthlessness of the debt in a year other than 1918, in contradiction of the proof by the taxpayer that the debt was ascertained by him to be worthless in 1918 and then charged off. The deduction of the bad debts should be allowed for 1918. See *Appeal of Steele Cotton Mill Co.*, 1 B. T. A. 299; *Appeal of Murchison National Bank*, 1 B. T. A. 617; *Appeal of Magnus, Mabee & Reynard, Inc.*, 1 B. T. A. 907; *Appeal of G. C. Krack*, 1 B. T. A. 1119.